Case number 18-149 et al., Environmental Defense Fund et al. Petitioners v. Environmental Protection Agency, and Lee M. Zeldin. Mr. Narayan, Petitioner. Ms. Lee for the Respondent. Mr. Lenz for the Respondent Intervener. Mr. Narayan reporting. Good morning, and may it please, Sanjay Narayan for the Petitioners. This case challenges EPA's project accounting rule, which redefines the modifications that require new source review under the Clean Air Act, and which in particular expands the circumstances under which sources can avoid review by claiming that increases are offset by decreases elsewhere. But before getting to the merits, I'll start with standing. And here, I think it's easiest to work from two examples, the Cumberland plant and the Roxborough plants that are described in our addendum at pages 293 and 307. Both of these plants are adding entirely new emissions units. These are large methane-fired turbines that emit hundreds of tons of pollution per year, so easily significant under EPA regulations. But under the rule, those plants are avoiding review by promising to take out older units three years, or perhaps more, after the new units start operating. So, as a result, there will be this three-year period, at least, when the old units and the new turbines are operating together, resulting in a large increase in the amount of pollution from the source over that period. So, I take it that if there were no project accounting, then that plant's project that you're describing would trigger major new source review? Well, one of the two things would have to happen. Either the plant would need to meet the requirements of EPA's contemporaneous netting requirements, that is, the prior netting regime. That regime would require that the decreases occur before the increases. That's in 5221B.3.2. So, you wouldn't have this multi-year period of increased emission from the source. So, that would be one pathway. Or, if they wanted to keep the project as is, then they would need to go through new source review, which would require much more stringent emission standards applied to the new source, the best available control technology, sorry, the new units. So, let's put aside the first possibility for a second, basically, whether the decreases have to happen before the increases, my understanding at first point. Yeah. So, that produces this multi-year pollution problem. So, if they wanted to avoid new source review, we would not have that multi-year period of enhanced pollution. Okay. But the second one is new source review. So, on the second one, where in the record does it provide evidence that the project would not escape the major new source review procedures? Procedures is the wrong word, but investigation. What is the right word? I mean, I think you could call it a process. It's a permitting regime.  A regime. A regime. Okay. Where in the record does it provide evidence that the project would escape that regime if there were no project accounting, if there were not this rule? Well, as currently structured, the old units are remaining in place for three years, maybe more, right, while the new units start operating. I hope I understand your question. Before you go, I want to help understand the beginning of your answer. That, what you just said, seems responsive to what you called the first issue. Right, but in order, that feature would prevent the project from escaping new source review, right? So, either they change that feature, which would provide us some relief, right, that the years don't happen, where they stop at that level of pollution, or they go through new source review, right? But so long as the decreases occur years after the increases, then the project would be subject to new source review, given the quantity of pollutions from the new units. I guess maybe, let me, maybe, let me see if I'm understanding the answer, and then let me see if I can ask the more precise question. Let's assume that you have standing to challenge the, whether it's contemporaneous, right? I'll be stumbling over that too. I'm not even going to try to go with the noun, but the adjective contemporaneous, let's assume you have standing to challenge whether what's going on is contemporaneous or not. You, of course, have other challenges too. Correct. That's not your only complaint about the rules. So, for all those other challenges, assume I, assume I think you have standing to challenge the question of whether it's contemporaneous stuff. For all those other challenges, I would think that you'd have to show that not only under this new rule does the factory escape the regime, but under the old rule, it would have been subjected to the regime. So, maybe first, just a clarifying legal point as to, and then just showing that you have four on the clarifying legal points, just in terms of standing, right, under Mozilla versus FCC, so long as the rule creates some injury, we can raise any claim that would lead to fixture of the rule, right? So, I take your question, but I don't think… Because we have a case from two months ago that we're working on that I think, I agree with you. So, just parking that, so the question is, is your question, if they change that aspect, that is, if they went ahead and conducted the decreases before the increases, then how do we know in that hypothetical? So, I don't think we have to show that, right? I mean, because that change all by itself would give us some redress. But there are two other features of new source review that are at least potentially relevant to sort of a substantial likelihood analysis. Although, yeah, I think the timing problem alone gets us there. But they would also have to make sure that the decreases are enforceable, which they aren't here. In fact, in some cases, you can see with the Cumberland plan that the date keeps changing, right, as to when the requirement is going to occur. And then second, they would have to conduct a source-wide analysis. Like, all the plans have to conduct a source-wide analysis of all of the other increases that have happened over the contemporaneous period. And look, I understand that this is something like, now we're talking about the things we don't know, right? Because one feature of the rule is that you never know what the source is doing across the entire plant. But, sorry, you didn't want to? I just want to say, I want to take one more shot at the question. I feel bad about monopolizing the time so far. But let's just imagine a plant that currently has a coal factory. And the plan is, close the coal factory, build a gas factory. And let's imagine that they're going to happen on the same day. I know. Okay. Yes, so this question. So that would meet the contemporary setting. There's step one and step two. Does the project have a net increase? And then does the source, step two is, does the source have a net increase? And step two has been the law for a long time now. You can't challenge it. You're not challenging it. But you're challenging the change to step one, where we look at the project and does it have a net increase as opposed to, right? Understand? Okay. So going back to my hypothetical, which is not too far from some of the plants in the record. It's going to happen on the same day. The coal plant closes, the gas plant opens. And you say, well, because of project accounting, they never get to step two. They avoid step two because they're able at step one to say this is not an increase. Okay. Now, where, what I'm wondering is, where in the record does it show where, under the old accounting regime, that factory does, would get to step two? Or would fail step two? Sorry. So would get to step two is just that, I mean, all of these projects are depending upon decreases, right? If you just look at the increases, then they would be significant and you would have to get to step two, right? So under the old regime, that there was a new unit at all, right? You just get to count the increases. There's a significant increase. And that, I mean, your choices are go to the source review or go to step two. So they would all get to step two. As to what happens at step two for, so I think there are, all of the examples in the McClintock declaration, over half of them have this timing problem, right? Where the decreases occur. And then there are five where that's not the case, right? Where they are. And for those, I think, right, they would get to step two under the current regime because the decreases aren't enforceable to begin with, right? But the other thing they would have to do is conduct a source-wide analysis. And because they haven't conducted it, I can't tell you what it would reveal. But, you know, we do have comments from the industry, the regulated industry, that say, you know, often, in fact, that analysis takes you to who requires resource review. That is at addendum 677, I want to say, and it's also cited in the McClintock declaration. So, sorry, it took me a long time. It took me a long time. So, I appreciate everyone's patience, including yours.  So, maybe now I'll just move on. So, can I try to LS my version of this question? Which is, assume you need evidence that supports a substantial likelihood that if you win this case, some of these plants will fail old step two. Which I think is where you were getting to just now. And because you don't actually get, well, first question, do you get redress just by forcing plants into step two review? Yes. I mean, again, for more than half of these plants, you would have a time-bounded period of increased pollution that could not happen, right? So, at Roxborough and Cumberland, we will have three years plus of increased pollution while the old units and the new units are running side by side. The concern is that, hypothetically, there will be a step two offsetting prior enforceable decreases that they just didn't claim in their permit application under step one. And so, once you get to the site-wide analysis, it's possible that same plant would still evade new source review. That's very hypothetical, but I think that's the hypothetical possibility where you don't get... So, I'm sorry. Here, the theoretical is that there are some past decreases that they haven't told us about. Correct. They didn't want to do the plant-wide review because that's more burdensome, but there are these other decreases out there. So, EPA seems to speculate along these lines that all you've shown is that they would have to get to step two. You can't show that they would fail step two. I mean, these are... So, the answer is that it's speculation, and I don't think we have to rebut every piece of speculation, right? But I'll say these are very large increases, right? Like, if you're adding multiple gas turbines, you need to do something like take out an old coal boiler to offset that. And that would be so obvious they would have probably claimed it in some fashion in their permit application, and we know they didn't. Right. I mean, among other things, right, taking out an old coal boiler would have reduced the plant's ability to actually provide electricity, right? I mean, they don't have to meet certain demand requirements. I think it is extraordinarily unlikely that would have happened, right, without anybody noticing and without it showing up. But can you... I just have another question about redressability. So, assume that... I don't know if this is true at Congress, but assume there was a permit, the change has been constructed, and now we vacate the rule. What's your understanding of what happens to that permit that is sort of an already issued permit? What's the effect of a vacate or ruling on that? Okay, so I'll give you a now answer, but just before that, right, for redressability, the question is what was true when we filed our petitions? And at that point, most of these permits hadn't even issued. But the now answer is that it varies by state, but most states, I think all states, have some sort of after-the-fact permitting process that they can use to bring projects into line with whatever the legal requirements are after this court rules. Maybe they can revisit that plant and hypothetically impose some new technology, but nobody's going to come in and say you have to bulldoze the new boiler you built. I've never heard of a state doing that, and I don't think they would. So, I'm nearly out of time. I have some questions. So, I don't want to launch into something new, but I'd be happy to answer further questions. That's helpful. I find my questions. So, one of your contrary to law arguments that you've already hinted at is that it is sort of intolerable to have any even temporary increase in emissions. So, I think one thing you said about Cumberland is where new boiler increase for three years, retire old boiler, and even if it eventually is decreasing emissions during that interim time, it's an increase. I completely understand that argument from a plain text reading, and I just want to know how you reconcile it or have us think about it in light of Alabama power, which does say that offsets need to be substantially contemporaneous. It's true EPA has chosen in step two to require them to be prior decreases, but there's nothing in Alabama power that required that. So, how do we think about how long of an increase would be allowed under Alabama power? Well, I mean, it's true that Alabama power did not say this is exactly what contemporaneous means, but it did tell EPA, you know, you need to operate within reasonable bounds. And given the statutory text, I think one reasonable bound has to be, I mean, I'm not going to put the bar higher than it needs to be. I'm not going to say any increase, right? But one reasonable boundary, given the text, is that you could not have a three-year or a five-year increase, right? Which, I mean, importantly, is easily enough to violate our quality standards. I mean, the other thing Alabama power says, right, is that the core function of these programs- Right, just to air out the difficulty as I see it, is I think you have to concede that if it was one week, that's either de minimis or it's substantially contemporaneous. And I think, I mean, I don't know, but I think a thousand out of a thousand judges would think 20 years is too long. Right. How is the court supposed to choose between that? And in some ways, it's hypothetical, but what if it was one year? How do we, what in the statute tells us whether one year is too much? So, I'll make three points. The first is EPA hasn't said this is de minimis, right? The one thing we know they can do is put in a de minimis exception, but nobody's making that claim. What if they said three years is de minimis? What tells us that that's a bad reading of the statute? I mean, I think the first thing to do if they said that would be to look at their record basis, right, for sort of, okay, like, why do you think three years of pollution would possibly be de minimis? But Alabama power does, in an earlier portion, EPA tried in that case to let very large, I mean, reductions of about, increases of about this magnitude go, right? And Alabama power said, well, actually, you can't do that. You are limited to de minimis. But, I mean, the main point is, right, if EPA wants to try to build a record to say three years doesn't matter, and they could try, I think it would be very hard, right? Because a three-year increase, right, is, again, plenty to interfere with maintenance of air quality standards. So, if Alabama had to build a record, they would have to engage with text context and structure. And one key structural point, right, is if you have a program and you can just see what they're set to do, if you are bypassing increases that could violate air quality standards, right, you at least need to grapple with it. And I think that'd be a very hard thing to overcome. It's certainly responsive. I also committed the cardinal sin of cutting you off after you gave one reason when you said you had three. Do you remember what the other two were? Well, no, sorry, the three were, I mean, they haven't evoked de minimis. They need to build a record. They haven't done that in the structural point. I have two questions. One is on the issue of substantially related. As I understand it, some states have SIPs that require substantially related. And some states don't? I don't think any state has it built into their SIP. And what EPA said in 2018 was that it thought many states applied a standard that looked something like substantially related. But when it came back to that question in 2024, what it said, and this is in the reconsideration proposal at the Federal Register, I think, 36878, it said, well, actually, what we were finding is that plants are not following the substantially related standard when they assemble their projects. And that's happening without documentation. And so as far as I know, based on the record, there is no indication that states are, certainly have this in their SIP, but that they are sort of following it or their sources are following it voluntarily. And as far as you know, the record suggests, according to you, the record suggests that no states are requiring sources to satisfy a substantially related test. Oh, no, I don't think that's right. Some states are requiring sources to satisfy a substantially related test. Some states are asking. Well, what I can tell you is that some permanent applications, because that's what we're seeing, do address the substantially related test. Now, what states are doing with that? All I have is EPA's 2024 statement that it is inconsistent. I guess I'll just get to the question. If the substantially related test is being applied in some places and not applied in other places, I'm wondering which of those two types of places, the declarants that are there to show standing, which of those two places are they in? So, if you look at at least three of the permanent applications that are attached to our sort of main declaration, the Domtar facility, the Heidelberg facility, Heidelberg, and the Ponca City, you can see that the applications don't contain any sort of substantially related analysis. I mean, this is, so, we don't know what the states, I mean, we can't see behind the curtain here, because one feature of this, right, is that we don't get to see what's happening under. Which declarant is affected by pollution from those places? Let's see. In the membership declaration, there are, I think, we listed two Sierra Club members near the Domtar plant. I couldn't tell you who they are, but they're in the organization declaration. Okay, that's helpful. My second question. But I want to emphasize MISLA versus FCC here, right? Like, we don't, any claim that gets vacature gives us standing. So, this is a question I don't have a full answer, but I also want to clarify that. I'm not sure it matters too much for standing. I think I might agree. Okay, the second question, I think there are no states intervening here or who have filed amicus briefs. Is that right? That is correct. There were states who filed comments, but we don't have anyone in that. It's not, like, totally, you know, directly connected to the merits of this case. But it just seems a little unlikely that if all these terrible things were going to happen that you say are going to happen, it just seems unlikely that there wouldn't be states, it seems unlikely that there would be no states in the case. We get cases like this all the time, and there's always 20, 25 states, and they're like, oh, no, the polluting states are going to make our air way worse and make it harder for us to achieve our goals. We do have comments from states like New Jersey, who actually was a party to this case until relatively recently. I can't tell you their decision-making process, but they were engaged, and they were heavily engaged in the permitting and the commenting process. And one comment they made is that this regime makes it, does not provide the information they need to actually enforce the rules that EPA is saying are necessary to the program. So states commented, right? I mean, I'm not here on behalf of states. I will say that you are seeing states in a lot of cases. That means states are very, very busy. You know, they can't be in every case, right? I appreciate that. I appreciate all your answers. Can I give a relatively quick question? On the substantially related, this arbitrary and capricious argument, the capsule summary of this argument seems to be EPA acknowledged that there are concerns about manipulating the scope of your project. It treats the substantially related standard as the solution to that, yet it doesn't make its binding, nor does it acknowledge that the rule does not make that standard binding. At least that's one version of the argument. Do you have a better way of articulating it? Yes. So at the first point, I think both their legal basis and their policy rationale depend on the idea that projects will only ever include what they are calling substantially related activities, right? Activities that have a meaningful interdependence economically or technically. The reason I want to hold their legal rationale to this is that, as I understand it, right, their entire justification for having both steps is that projects only include related activities. If projects can include unrelated activities, then I think it all falls apart, even in their narration. So they rely on that assumption. And what I'm saying is the only basis for that assumption, right, is their claim that, we have gestured, even while they have no effects on regulated parties at all, right, nor on states. So I think what that necessarily means, right, is that if a source violated it, nobody could come to them and say, well, actually, now you're liable, right? If it has no, I mean, if it really is that meaningless, right, it has no practical effect, then it's an empty set. And, you know, again, I think it is relevant here that what they have in their record is not a robust record of sources voluntarily complying with the test. It is, you know, two examples which they cited are the only, these are the only examples that I know of in the record where they say, well, actually, what we're seeing is sources assembling projects since 2018, right, when they put this big piece out there that do not comply with the standard. And that's happening without documentation. So in a way that would be extraordinarily hard to correct after the fact. Thank you. Okay, thank you. A brief record on behalf of the United States Environmental Protection Agency. With me at council's table is Brian Doster of EPA's Office of General Counsel. The accounting rule clarifies how emissions from a project are calculated. Specifically, EPA clarified that at step one in the two-step process for calculating an increase, sources must account for all components of that project, the emission increasing components and the emission decreasing components, rather than consider the emission decreasing components at step two with other contemporaneous activities or not account for them at all. In challenging the small clarifications, petitioners fail to meet their burden of establishing standing, and this court should dismiss their petitions. If the court pursues the merits, it should deny the petitions because EPA's accounting rule provides the best reading of the term increases in the definition of a statutory modification and EPA reasonably address the comments they receive on the accounting rule. Starting with standing. Petitioners' theories of standing are all premised on the same conclusion, that if you take away the accounting rule, these facilities, these projects that they've identified in their declarations would likely trigger a major new source review. But where it falls apart is what was discussed in this prior conversation, that even under petitioners' interpretation of the term increases, there are two steps. These projects must exceed the significance threshold at both step one and at step two. What's missing here is any step two analysis to demonstrate any likelihood that these projects would have triggered major new source review under petitioners' regime. Considering that their theories of standing are all premised on this critical point that's missing, this court, petitioners have not demonstrated standing, and this court should dismiss the- First, I'm not sure their informational standing is based on that, right? Because even reaching step two requires more work, more disclosures that would result in more information for that one. No, Your Honor. Their informational standing is premised on 42 U.S.C. 7475. That's in their opening brief. That provision of the Clean Air Act entitles petitioners or the public to information if major new source review is triggered. Now, in their reply brief, they've mentioned that they would- that certain informational injury would be redressed had these projects reach step two, but they have not identified anywhere in that reply brief or in their declarations that would entitle them to this information at step two that they purport they do not have. And so, they have not- So, to the extent that they're alleging an informational injury for not having information at step two, they have not substantiated where that cognizable injury stems from. So, no informational injury there. I'd just like to address the two standing points that petitioners were discussing. First, as it relates to the Cumberland plant and the timing of the project. So, the argument that there's a three-year delay, we disagree with that. If you go to the McClintock declaration where she discussed this, the Cumberland plant, what's really happening there is that the permit was issued at a time period, and then the old units would retire three years later. And what the permit application says is that these new units would be installed around 2024, 2025, and the old units would shut down one year later. So, it's not a vast difference in time that we're talking about. And so, as to that- There's still an example of, if they are correct in their merits arguments, that that application would not be able to evade new source review just by virtue of step one. It is a future decrease rather than a past decrease. That's correct. But then again, there's no information regarding what would happen to this project at the Cumberland plant at step two. That this project would have exceeded the significance threshold at step two to then trigger major new source review under petitioner's regime. So, there's- So, this Cumberland plant by itself fails to establish standing as it pertains to- To get standing, you think that they need to sort of do a site visit and to run their own step two analysis of the entire plant, which is the whole point of this rule is to help the industry avoid this extremely burdensome step two, right? So, I don't- As to what petitioners need to do to demonstrate standing, that's petitioner's burden. We're just pointing out that the three elements of standing are not evident here in petitioner's declaration. And I'll just want to put it in context. This rule has been in effect for five years. Petitioners have not demonstrated that within this five-year period, that there's been a project that would have triggered major new source review under petitioner's interpretation that no longer triggers new source review now. I think, though, you know, Judge Garcia was- I heard him to be asking, you know, what would be enough for standing? And I know you think what they didn't do was enough, but usually the way we know something isn't enough is we know it isn't enough. And in order to get there, we have to know what is enough. So, maybe be a little more responsive to his question about what would be enough. Sure. There should be some information as to what would happen at step two. Now, I think petitioners have attempted to do that by citing to one industry commenter who had said that if you proceed to step two, maybe it's likely that major new source review would be triggered, but that's not representative of industry's comments. There are other industry comments in the JA where what simply said is that without project- without this accounting rule, it's more likely that you would proceed to step two. But there's no information in the record suggesting that if you proceed to step two, then you're more likely to trigger major new source review. There was no information like that in the administrative record. So, in terms of what petitioners would need to do, then yes, their burden is higher here. As I explained, this is a small clarification in how the term increases is determined. So, on what the evidence that they- whether what they have right now is enough. One thing they seem to be arguing is at a plant like Cumberland, this is a huge increase that you want to be offset by a huge decrease, which makes sense. But on their position, you cannot account for that huge decrease. So, to think that they haven't, just by doing that, shown it is substantially likely that this plant will fail at step two also, you need to speculate that in the last five years, there have been sufficiently large decreases that are going to offset this extremely large increase. Right? That's what we're talking about. You're speculating that there would be claimable decreases under step two regulations that offset the large new emissions-creating modification. My answer would be a bit nuanced, more nuanced than that. It would be petitioners have not demonstrated that during a contemporaneous time period, that there were no significant contemporaneous decrease that could offset- Well, can you just answer just literally what we would be asking? We would be hypothesizing, forget whose burden it is. We would want to know whether there were decreases within the past, I think it's five years, that offset the large new increase. Correct? That's just how this works, right? Correct. Okay. Yes. And so- Can I take you to the merits? Yes, I'd like to take you to the merits. On the substantially related issue? Yes. I mean, one pretty simple reading of several different pages of this rule is that EPA acknowledges that there is a concern that without some guideline, some standard by which permitting authorities and then enforcement authorities will judge what can constitute a project, there could be manipulation. And then the next paragraph always says, but the substantially related standard will solve that problem. And the rule, the concern seems, my concern is the rule does not acknowledge that that standard is not binding. And why is that? Why is treating something, acknowledging a problem, treating the standard as the solution, but not acknowledging that it doesn't bind anyone? Why isn't that arbitrary and capricious? It's not arbitrary and capricious because the question was, as you had pointed out, what are the guidelines? Is there any guidelines? And EPA provided that guideline. The fact that it's non-binding or binding is a different question. So the comments that EPA received at proposal were based on the fact that EPA proposed no guideline at all. And in that situation, the comments that EPA received related to the concern that sources would arbitrarily group project activities together to create a project and have full discretion to do so. And in response to that, EPA provided guidance saying that this guidance, the substantially related standard, will apply to this rule as well. The secondary question that's being raised... The preamble isn't the rule. The regulation is the rule. And nothing in the regulation says what you just said. Nobody has to follow the substantially related standard. That's correct. Yes. But we're talking about whether... So maybe on remand, there can be a really good explanation in here about how the substantially related standard solves all these problems despite not being binding. And, you know, we're going to rely on voluntary adherence. And we've looked at the types of good questions Judge Walker was asking many states. Most states already do this. So we just don't need to make it binding. But that kind of explanation is not in this rule. Well, an explanation as to why some discretion is needed here is in the record for the accounting rule. You can look at RTC 67 and 76. I believe that's J251, 260, where we explain that given the highly fact-specific nature of defining a project, a case-by-case approach is more appropriate than a bright-line one. I completely understand that argument. It's actually the argument that you gave in 2018 for why substantially related shouldn't be the standard. Because it's not a bright-line standard. It's just saying you have to be substantially interconnected. And there's a presumption about three years. That was EPA's example of a good, flexible standard. So what's still missing is the explanation of why it was not made binding. As to that question, though, that comment was not raised to EPA during the rulemaking process. It was raised in Petitioner's Petition for Mandatory Reconsideration after EPA promulgated the accounting rule. So in terms of the comments that EPA received and addressed, it reasonably addressed it. And it was—and EPA was not on notice that it needed to address that other issue of whether it needed to be mandatory and part of EPA's regulations. And I think it's reasonable— In their reply brief, they cite JA 127 to 28. Yes. And when I read it, my notes reflect that it says the substantially related standard can't solve your problem because you didn't make it binding. And that's in the comments. That's not the reconsideration. When you consider the three—those three pages of Petitioner's initial comment, what they're really concerned about was the fact that EPA proposed no criteria at all. And I think the way that they've characterized their comment in their accounting rule in their Petition for Mandatory Reconsideration is reflective of what they were actually concerned about in the—during the rulemaking process for the accounting rule. Not only was EPA not on notice that it needed to address whether the standard needed to be mandatory, but it was reasonable for EPA to not do so. If we look at Petitioner's declaration, the examples of the projects they provide, they're all substantially related activities. They're all improvement projects. They're all projects seeking to replace old, inefficient units with newer, more efficient, technologically advanced ones. We can also look at Petitioner's declaration as it concerns— This is about—thank you. Can I ask about this temporal issue? Yes. Just from the statutory's perspective, I just will be—I just find this very difficult. So, I think if I previewed what I think is probably right, which is if you pass—if you come up with a standard that says it's okay so long as you have a decrease in the project, that most people would think that it violates the statute somehow. But also, if it was one week, most people would think it doesn't violate the statute. Yes. I mean, do you have a way for us to think about where that line might fall? Yes. So, this rule only talks about one component of the definition of statutory modification. And I think your hypothetical, Your Honor, gets more to that 20-year length of a project may well not fit into the common-sense term of any change. Now, we're talking about increases only here. And so, we take whatever that project is. But as to your concern about a 20-year-length project may have problems in terms of is it actually a statutory modification? I think the problem would be addressed by the term. So, five years, right? Here's our project. Today, we are constructing a new boiler. We've got a good explanation, but we're going to retire the old one in five years. Yes. Does that violate the statute? When it comes to the term increases, that term inherently includes a temporal component. And so, given that, it's important to know—it's important to set the time frame in the most appropriate way. Given that the subject matter here is any change or a project, then the appropriate time frame for evaluating the length of an increase would be that five-year period. Now, in terms of—so, we would say that it fits in with the plain text of the term. Increases. The other way to look at it is even under the statutory scheme of the Clean Air Act, we consider emissions over several—over periods of time. So, when we say—when we try and see whether a state is attaining or exceeding federal air quality standards, we don't base it on any singular point in time. We consider it over a temporal time range. For example, for the ozone standards, we evaluate whether a state is exceeding or attaining ozone federal air quality standards over generally a three-year period. So, I guess under your hypothetical of five years, it would potentially, you know, result in an exceedance of the ozone standards. But here, the text—what the text is looking at, the subject matter is any change. Now, in that hypothetical example of a five-year change, that might be a question as to whether it's even appropriate to define that project as any change under the plain text of the definition of the statutory modification. But if it were to pass that part of the legal test and we proceed to the term increases, then we would say it's within the plain text because the temporal scope that you evaluate increases in is the beginning of the project to the end of the project. So, I hope that helps address your temporal questions, Your Honor. Thank you. One question about if we were inclined to grant a petition, there's a question about remedy. Yes. And I wonder if you have an explanation of what the disruptive consequences would be if this rule were vacated. Your Honor, in our brief, we respectfully requested a supplemental briefing if we had to reach the remedy stage. And so, you know, I'd have to— I mean, we typically—the default is remanded with vacater. And we typically see this argument in the brief from the agency. So, do you—I understand that. I saw the request. Do you have anything to say to that? Sure. I would say that there are—as it relates to the merits, there are two distinct issues. There's the statutory interpretation issue of whether EPA's accounting rule provides the best reading of the term increases. And then there are two record-based issues as it relates to arbitrary interpretations. And so, I would say that if the court were to grant a petition for review on both grounds, then, you know, there would be no basis for remand because you would find the accounting rule unlawful. But, you know, given that there are two distinct issues, if the court were to uphold EPA's interpretation of the accounting rule, then we would argue that remand without vacater is appropriate because, as you had suggested, Your Honor, as it relates to the substantially related test, if the question—if the concern is that EPA didn't reasonably address the comment that the standard needed to be mandatory, it could do so on remand. But I'd further like to note that EPA did reconsider the accounting rule. And in doing so, it promulgated the withdrawal notice, which, despite the fact that petitioners petitioned for review, did not raise any challenges to EPA's reasonableness of the withdrawal notice. And during that reconsideration, EPA had considered promulgating regulatory text related to the substantially related standard. But upon receiving numerous comments, it determined that, in fact, adding that regulatory text would add more uncertainty and not provide—not address and provide no additional benefits. And petitioners did not challenge the reasonableness to that. So we'd be happy to provide additional briefing on remedy to the extent the court goes there. However— Why EPA chose not to make this binding? Do you have a citation for that? I do. It's 34207, second column. Can you say that one more time? Yes. 34207, second column. Okay. All right. Thank you. Thank you. Mr. Lin. Good morning. You may please the Court. Albert Lin, on behalf of Respondent Intervenors. Judge Garcia, I'd like to start with your merits question about the—what you call the temporal question. I think of it as sort of a ramp-up, ramp-down question. And I think the way that I would approach that is, the first question I think is, is it a statutory question or is it an arbitrary and capricious question about EPA's exercise of judgment? I don't think it's a statutory question, period. I also don't think it's a statutory question that's raised in this case. So, as Judge Walker observed, right, this rule does a very limited thing. If you look at the regulations, all it's doing is it's clarifying that when you're thinking about what an increase is under the statute at step one, you're including both increases and decreases. I think that follows from the plain text. I think it follows from Alabama Power because if you're thinking about, you know, what is the emissions result from a project and whether increases you should be looking at, both the increases and the decreases. I don't think there's anything in the analysis of what increases means that requires a particular time limit. And I didn't hear my friend on the other side say that there's a statutory—you asked him, I think. Is there something in the statute that requires a particular, I don't know, five years, six years, seven years time limit? Well, it seems to say zero days. It does, yes. And I don't think there's any—I don't think that they have offered a statutory basis for that. I think the closest they come to it is they say, this is what a change is, right? That a change can only really have one step, that it's got to be something that happens and then everything else is not included in the change. And I have two answers to that. And the first is, the meaning of what a change is and whether a change can be multi-step, that was not introduced in this rule. That's been part of this regulatory regime since at least 2002. And the very fact that the regulatory regime talks about a sum of the differences for each unit is assuming that you have changes, projects changes that are used interchangeably because project is defined as a change, but you have changes that have multi-steps that involve different units. So that's not at issue here. I think the answer to your question is it really does collapse into the substantially related question, right? And it's, has EPA adequately addressed the concerns raised about potential circumvention and over-aggregation? I think it's really what you're getting at. Just so I, to ensure we're on the same page, when you refer to the definition of a change, and then I think we agree, they're using project as a proxy for change. Yes. And so the concern that you're about to address is that this rule does not define project. In any binding way. There's some guidance. Yes. There's no binding way. So why is that an appropriate regulatory approach?  So again, two answers. One, I don't think it, I don't think that this rule is addressing as a statutory matter what project means and project is defined. I think it's addressing what it increases. So assume I think that's the problem. You're making, this whole rule has made the meaning of project the centerpiece of the revised step one. And yet it doesn't tell anyone what it means. And that is at least one of their complaints. Probably is more, it in some way has a statutory component. If you think that leaves it open to someone to define a project as spanning 20 years, but at minimum, it's an arbitrary and capricious issue, right? Yes. Okay. Yes. And I'll get to that. I'm sorry. I will get to that. I don't think that there is, they have certainly not offered, I think, a reason to impose some kind of bright line rule on what a project is as a statutory matter. I think the question is, is substantially related, right? And this gets to the arbitrary and capricious question, Your Honor, that you were talking about. Is that enough to address their concerns about over-aggregation? And I think it is for two reasons. The first is, at least as to the argument that they are making, and Your Honor, Judge Garcia, you had sort of asked, like, what exactly is the argument? I think the argument, as I read it, that they are making is that EPA has said, they pulled up essentially a bait and switch, right? This is a mandatory standard that's going to fix this problem, and yet it is not mandatory. That's how I read their argument. I think they say a couple places that this is a requirement, that it's going to fix it. My first answer is, I think if you read the preamble, which is where all of the discussions of substantially related test is, that's not what EPA said. They say some more, the word I would use is, like, predictive. They make some predictive judgments about how the substantially related test would work. And so, I think if you look at, for example, 85-FedRx-74-898, which is, let me just make sure I can point you to the page. The application of the substantially related test should be sufficient to prevent sources from arbitrarily grouping activities. Should be. Comment in the record that says, how can that possibly be true when you aren't making it binding? Right. The answer is EPA doesn't say it's binding, right? I think their argument is assuming that EPA is treating it as binding, and that it will do certain things as binding. But EPA is not saying it's binding. I have a similar question to Jeff Garcia. And I think this has been really, your back and forth has been very helpful. Because there's possible, there's two possible mistakes. One possible mistake would be if EPA had said it's binding, and then it turns out it's not  Right. And you think you're arguing that they never said it was binding. Correct. The other possible problem would be if EPA said, there's a problem, and this is the solution, even though it's not binding. And so what's your answer to the argument that it can't be the solution to a problem if it's not binding? Two answers. The first is, they say that this is a potential problem. Right. And I think that that's important, just as a preface, because when you're judging arbitrary and capricious, you're figuring out, have they done enough to address the problem that's actually there? It's well established in this court that they can deal with problems in an incremental fashion as they come. So I think they've acknowledged that over-aggregation is a potential problem. I don't think the record shows that there is a really serious, or frankly, really a problem of over-aggregation at all. So I think if you take that as the baseline of the problem they are acknowledging, what they've said is, we have the substantially related guidance, and it should address this problem. We're making a predictive judgment, a problem that we think is possible, but there's no evidence that's really actually happening. And so we have the substantially related test that is a predictive judgment that it should address it. If the problem becomes worse in the future, EPA can revisit that, and they can impose a stronger standard. And that's well set out in this court's precedent. So I think that's answer number one. And now I've lost what answer number two is. Yes, I'm not sure if you've lost it. But good, because I had a question about that. I think that the principle, the general abstract principle that you're asserting there is a strong one. The bigger the problem, the bigger solution you need. And the converse, the more kind of theoretical, speculative the problem, the less certain a solution you need. So assume I'm with you on that general principle. What, you know, we're writing this opinion, or let's say we're writing the opinion, let's say we're going to write this opinion and say that there's, you know, it was not arbitrary capricious, and we'll have a sentence that says, look, the problem does not seem to be a big problem, and it doesn't seem to be a particularly certain problem. But EPA did acknowledge that it's possible that this could be a problem. And the reason why the substantially related concept is enough to address that possible minor problem is, and what should we write after that? It's regulatory guidance and regulated entities. I mean, the EPA issues regulatory guidance all the time, as do other agencies, and regulated entities take it seriously. That's why it's there. I think that's what I see in the record and in the briefs. And let me see if I'm kind of translating it to myself in a, you know, if I'm correct. What is binding is you're not allowed to over-aggregate. You're not allowed to basically cheat. Yes. And the substantially related concept is sort of a safe harbor that the EPA has thrown out there and said, look, you know, regulated industries, if you are within the ball, if you're doing substantially related as your test and you're satisfying that test, you know, we think there's a really good chance that you're safe. If you want to do a different test, you know, knock yourself out. But if you don't, if you do a different test and you cheat, then that's an enforcement issue and you could be subject to some pretty bad punishments. That's exactly right. Your Honor, two things. One, I mean, I want to acknowledge, right, it's not binding. And so I'm not sure a safe harbor. I want to be fair. I'm not sure a safe harbor we can be able to say, well, we did it. We're absolutely protected. But it is regulatory guidance. And this is why regulatory guidance exists. And the other answer point I wanted to make is there are serious penalties, right, for violating NSR. And, I mean, as DOJ and EPA have pointed out, the rule says regardless of your pre-construction projections, if you have a significant increase or a significant net emissions increase, that is a violation of the rules. And there are civil penalties. There are criminal penalties for knowing. We want to get this right, right? And so I think you, as you do in all administrative cases, you assume that the guidance is going to have effect in the world, and they're making a predictive judgment. And I think that is classically the realm where EPA gets its deference. The other point I wanted to make, though, Judge Walker, you articulated the two potential arguments, right? One is EPA said this is mandatory, and it's not actually mandatory. That's like, I don't know if you want to call it a bait and switch, but it's like it's premising on something that's not true. And the other is this idea of is their predictive judgment really right? I want, they are not making the second argument. They are only making the first argument. They rely on the Portland Cement case. They rely on the Ohio versus EPA case, and they say it relies essentially on a false premise. There is nothing in this preamble where EPA says the substantially related test is mandatory. In fact, they go to great pains to say we are carrying it over from the 2018 aggregation action. And I think you can fairly assume when EPA is referring to the 2018 aggregation action that they have read it. And the 2018 aggregation action itself says this is not mandatory. So I think it's a fair inference from the preamble, and I think EPA should get the benefit of the doubt here, that they knew this was not binding when they adopted it, but they carried it over. But they're saying that there's a predictive judgment here. I don't want to ask about remedy, but if there are any follow-up? Just one related question. So in this scenario where I think you said of course someone can't lie, and the question is lie about what, right? So I guess it would be you can't have a completely unreasonable definition of your project slash change. And so normally if someone were going to bring an enforcement action against a regulated entity, they would need to identify a legal requirement that was being violated. So where is the, in this scenario, where is the legal requirement to have a reasonable definition of a project coming from? Because my understanding is that there's just nothing in the regulation that addresses that. One reasonable answer might be it's just self-evident on the face of the statute and the regulation that you can't, you know, make this up. Is that, would that be the source you would just, EPA would cite the regulation that says you can only count a project and kind of give me a break? You were too broad here. I mean, I think I might have put it slightly differently, but I think that's basically, and I think, look, the statute is also the law. The statute says that a modification is a physical or operational change, right? The word project is defined as a physical operational change. I think you can, EPA doesn't have to promulgate a rule to enforce the statute. And the statute says this is a change. And you can argue that something has been unreasonably defined as a change. And in fact, Your Honor, if you look in some of the minus source NSR applications that were talked about today that are in their statutory or the addendum supporting standing, they have, you know, submitted notice and comment to some of these in some of the states and said, no, this project's definition is unreasonably broad, right? It doesn't, it's not really a project. So I don't think you have to have a specific regulation that defines with more specific detail, right? You can enforce the statute. You can probably tell from my questions, I'm not sure that I think we should get to remedy, but if we did get to remedy, what is your argument for why VACADR would be highly disruptive and how disruptive would remit without VACADR be? So, again, I will answer your question, but I would join DOJ in asking that if you do want to reach remedy, that would be... That's kind of a weird thing. I'm going to guess that wasn't your idea to, like, not address remedy in the briefing. We get a lot of these cases to be, it seems like we get a lot of these cases that usually address remedy in the briefing. Understood, Your Honor. I do think, so in terms of, there's obviously the two pieces to the allied signal question. I think particularly if this is on arbitrary and capricious, I don't think it's a serious enough error to satisfy the first prong. I think it is something that they could justify, but again, I don't think it's arbitrary and capricious for the variety of reasons. In terms of disruptiveness, I mean, as you see from the minor source NSR applications that are complete in their addendum, there's been a lot of projects that have gone forward under this rule, and I do think it would be highly disruptive. I mean, you have stuff that's in progress right now. I mean, they basically said it would be highly disruptive when they were trying to explain how they had addressability. Right, exactly, and they didn't come in and ask for a stay. I know this Court is well familiar with the increased, you know, stay docket, but I mean, this rule has rolled forward. And how disruptive would remand without backer be? I get less, but how disruptive would it be? I think if the rule remains in place, I don't think it would be very disruptive at all, but again, I don't know. I've made my point clear. I think you should deny the petitions. Any questions? Thank you, Your Honors. All right, about two minutes. I'll just make three points. One, there were some questions about the duration of the delay in Cumberland. I'll direct you to pages 430 of the addendum, which says that the new units in Cumberland come on in 2025, and then if you look at addendum 442, you see them saying that the old units will come offline in 2028, right? So that is the length of the delay. It is three years. And then 604, 605, that's the description for Roxborough. And there, the agency is saying, it's very clear. There's no requirement that the old units come off separate. So it's not mandatory. That is not required. None of that is part of this permit. Second, on the question of these multiyear increases, I think that there may be some room for EPA to adjust these sort of rate measurement questions to address those in this statute. But what EPA said here, right, is increases in MVUs. What we are doing is deploying broad policymaking authority to weigh costs against benefits. That, first, is a statutory rationale. That's not right. Whatever play there is in the joints here, that needs to proceed from text context structure. They've done none of that work to sort of explain their discretion. And more to the point, you know, that discretion would be bounded to technical questions. For example, like, if they think three to five years is fine, and that is part of this sort of rate measurement discussion, they need to build that record. And I'll say that, you know, National Ambient Air Quality Standards were measured in one-hour periods, eight-hour periods. Even if you want to fold in the fact that it can take three years of combined violations from all of your sources to create a actual, to put a penitentiary in nonattainment, right, three years is plenty under any of those measures. But more to the point, they've done none of that work in this record, if that were to be their rationale, which it isn't. Their rationale is just, we get to weigh costs and benefits. This is where we came out. If you can see, though, that they don't have to achieve the decrease before they do the increase. That's right. I mean, look, there is going to be some de minimis period, right? They have de minimis authority. But I don't think you can fit these within de minimis, nor have they tried. And then there were some characterizations of what our argument is on the substantially related question, right, this sort of arbitrary and capricious standards. So I just want to be clear, right, their rule, in our view, turns almost entirely on this proposition that projects only include related activities, right? If that's not right, their legal rationale falls apart, too, because their entire reconciliation of step one and step two, right, is one of these things is about unrelated changes. One is only about related changes. If they're going to make that claim, they need some basis for it to be true. Now, we are not saying that they need to make this test mandatory. We're not saying they need this test. If this is too bright a line, find a different test. If you're going to make a predictive judgment, give us a record basis for your predictive judgment, right? If all you have in the record are, you know, examples of sources that are not following your 2018 aggregation, right, that are policy, well, then your predictive judgment does not appear to be supported by the record. So I think that is clear from our comments at the 25 and 27, as you noted. And... Do you have examples in the record of sources proceeding in some way that would violate the substantially related standards? Is that what you just said? Well, so EPA... Or without regard to the substantially related... In the reconsideration rule at 89 Federal Register 36828, and then there's a footnote at 6465, I can't remember, EPA says that we have found that sources have not been following the 2018 policy, and they've been doing so without documentation. And then they cite two examples, one in Louisiana, and I can't recall where the other one was. And then, you know, if you look at the project here, you know, I think it is relevant, right, that in this Roxborough example, you have the agency telling the permittee, look, we don't think retirement is mandatory at all, right? You just need to tell us you're doing it, which is at least in tension with the substantially related standards, right? I mean, because you would think that at a minimum, if there is some sort of dependency between the two, that retirement would have to happen, right? If it is optional, if it doesn't have to happen, then I'm not sure how it fits with our standards. And that is at addendum 604, 605. Thank you. Is there no more questions? There's another question. Thank you. We have to go. Thank you.
judges: Henderson; Walker; Garcia